Moss, Judge,
delivered the opinion of the court:
Plaintiff, Asiatic Petroleum Co., is suing for the recovery of a balance of $121,876.16 due on purchase price of fuel oil sold by plaintiff for the use of the Navy under a certain contract dated May 7, 1923. The amount claimed is admitted, but defendant has interposed a counterclaim for the same amount alleged to be due and owing to the Philippine government as customs duties on oil delivered under this con *109 tract and also under a prior contract dated December 18, 1922. No duties have been paid by either the Government or plaintiff, the Government contending, however, that it will be required to pay same to the Philippine customs officials.
It is stipulated that the oil under both contracts was consigned to the United States. Section 15 of the Philippine tariff act, 36 Stat. 174, provides that all property imported into the Islands shall for the purpose of that act be deemed to be “ the property of the person to whom the same may be consigned.” The United States would therefore, as between the parties, be liable for customs duties, if any should be collectable, unless expressly assumed by plaintiff under the contract. It is contended by defendant that under the terms of the contract plaintiff obligated itself to pay such duties, and in support of that contention cites paragraph 3 of said contract, which reads as follows: “ The customs duties on imported articles used in the fulfillment of this contract are included in the price herein set opposite each item, and therefore the contractor will not be entitled to free entry or remission of any customs duties.” Each contract in this case consisted of a standard printed form of Navy contract, used in connection with the purchase of all manner of supplies, within which was inserted a mimeographed schedule relating to the proposed purchase of fuel oil. The mimeographed portion of the printed form invited proposals for fuel oil to be delivered at a number of places, including Cavite, Philippine Islands. Plaintiff bid only on the oil to be delivered at Cavite, and there was inserted in appropriate places, in typewriting, plaintiff’s proposal, which in part is as follows: “ * * * but maximum annual quantity not to exceed 750,000 bbls. to be delivered c. i. f. Cavite, in cargo lots * * By this provision plaintiff limited its obligation to a quantity not to exceed 750,000 barrels “ to be delivered g. i. f. Oavite,” at $11.48 per ton. Plaintiff’s proposal was accepted and became the contract between the parties. The term “ c. i. f.” has a well-understood legal meaning in commercial transactions. In simple terms it means that the price quoted included cost of goods at point of shipment, insurance, and freight to point of delivery. All other charges, if any, including import duties being assumed by the buyer. *110 Thames & Mersey Insurance Co. v. United States, 237 U. S. 19, 26, and numerous other decisions cited in plaintiff’s brief. The paragraph in the printed portion of the contract upon which defendant relies is clearly inapplicable to the contract under consideration, and obviously refers to customs duties accruing to the United States and concerning which the United States could contract. It will be readily seen that the Government would have no authority either to relieve the contractor from the payment of customs duties imposed by the Philippine government or to remit such duties. Manifestly this printed paragraph was left in the contract by inadvertence. At any rate, it is inconsistent with the typewritten matter mentioned, and the latter must be regarded as the true agreement between the parties. Harper v. Hochstim, 278 Fed. 102. It is claimed by defendant that the contract in this case is only a modified c. i. f. contract by reason of the fact that insurance policies and certain freight credit memoranda were not delivered to the defendant as contemplated under a c. i. f. contract. However, prepaid bills of lading were in each shipment delivered to the master of the ship, an independent carrier, for delivery to the proper naval authorities and same were so delivered. No better evidence that the freight had been paid could have been supplied. Insurance was secured, payable to the account of plaintiff, or “whom it may concern.” Failure to deliver same to the naval authorities constituted, at most, a breach of contract, without damage to defendant. If there had been a loss, unquestionably defendant’s rights would have been protected under the clause “ whom it may concern,” but there was no 'loss, and the mere failure to deliver the policies to the naval authorities is immaterial. The contract is a c. i. †. contract in all essential characteristics, and under such a contract plaintiff is not liable for any charges, except cost, insurance, and freight.
While not necessary to a decision of the case, it is not inappropriate to state that the court is in extreme doubt as to whether or not the oil in question was dutiable. Whatever may be said as to when the title to the oil passed, as between the parties, such oil for the purposes of the tariff act *111 was the property of the United States at the time of its importation into the Philippine Islands. Is the United States liable for customs duty on property imported by it and for its own use? The act itself is silent on that question. It should be remembered that no duties were demanded until after the full completion of the first contract under which 50,167.6058 tons of oil were delivered and paid for, and until after 14,460.7 tons under the second contract had been delivered. It can therefore be said that the customs officials themselves did not at first regard this property as dutiable. It should also be noted that when duties were subsequently assessed it was sought to impose same only on that portion of the oil which was delivered into naval tanks at Cavite, and not on the oil discharged directly into the U. S. S. Peco». Both deliveries were within the jurisdiction of the Philippine Islands. The first section of the act, 36 Stat. 130, provides that the duties therein imposed shall be levied upon “ all articles * * * entering the jurisdiction of the Philippine Islands from any place or places, including the United States and its possessions, and in any manner whatsoever, either with intent to unlade therein, or which, after such entering, are consumed therein or become incorporated into the general mass of property within said Islands * * It is stipulated that all the oil discharged into shore tanks was either reexported or consumed in the propulsion of Navy vessels. The delivery into said tanks was a temporary matter of convenience. Section 21 of said tar,iff act provides “ that on all fuel imported into the Philippine Islands, which is afterwards used for the propulsion of vessels engaged in trade with foreign countries, or between ports of the United States and the Philippine Islands, or in the Philippine coastwise trade, a refund shall be allowed equal to the duty imposed by law upon such fuel, less one per centum thereof, which shall be paid under such rules and regulations as may be prescribed by the insular collector of customs.” It is true that this provision applies only to merchant ships. However, the startling incongruity presented by this situation in connection with the attitude of the Philippine government concerning the liability of the *112 United States for the payment of tariff duties is worthy of consideration. Under section 21 this oil which was used for supplying naval vessels would have been subject to a refund of duties if, instead of having been imported by the United States for such purposes, it had been imported and stored in tanks by a steamship company and subsequently used for the same purpose. It will scarcely be believed that Congress intended to produce a situation which would result in such an unjust discrimination.
The purpose of the statute providing for customs duties on importations into the Philippine Islands was to provide revenue for the use of the Philippine government, for the protection, and partial support of which the United States held itself responsible. It is inconceivable that Congress in the enactment of the said statute should have intended that the United States would be required to pay duty on its own oil imported into the Philippine Islands, for its own use, in supplying its Navy vessels used in the protection of the Philippine government, as well as for the maintenance of ,its own Military and Naval Establishments in the national defense. It is not necessary to decide any other questions at issue in the case. Plaintiff is entitled to recover herein, and defendant’s counterclaim should be dismissed, and it is so ordered and adjudged.
GRAham, Judge; Booth, Judge; and Campbell, Chief Justice, concur.